# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs March 2, 2021

## JAMES EGGLESTON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 13-01603        Chris Craft, Judge

_____

**No. W2019-02080-CCA-R3-PC**

_____

The petitioner, James Eggleston, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received the effective assistance of counsel at trial. Following our thorough review of the record and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and TIMOTHY L. EASTER, JJ., joined.

Rob Golder, Memphis, Tennessee, for the appellant, James Eggleston.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Facts and Procedural History

*A. Trial*

The petitioner was convicted of aggravated robbery for which he received a sentence of eighteen years and six months as a Range II, multiple offender. *State v. James Eggleston*, No. W2014-02103-CCA-R3-CD, 2015 WL 5001197, at *1-3 (Tenn. Crim. App. Aug. 21, 2015), *perm. app. denied* (Tenn. Jan. 25, 2016). This Court affirmed his conviction on appeal and summarized the proof presented at trial as follows:

At trial, the victim, Charles Rye, testified that he drove a taxicab in Memphis. In the early morning hours of April 12, 2012, he parked his taxicab next to the sidewalk at a BP gas station on Poplar Avenue. Mr. Rye entered the store. As he exited the store, he saw a man coming around the corner of the building. The man was mumbling something incoherent. Mr. Rye addressed the man and asked, "What?" As Mr. Rye got the keys to the taxicab ready to unlock the door of the vehicle, the man hit him in the forehead with a large rock, knocking him to the pavement. Mr. Rye received a large laceration on his head. When Mr. Rye looked up, he saw his taxicab pulling away.

Officers of the Memphis Police Department ("MPD") were summoned to the BP station upon a report of a carjacking. Mr. Rye was able to describe the man to Officer Rebecca Tarena upon her arrival. Officer Tarena called an ambulance to attend to Mr. Rye. Upon learning that the taxicab was equipped with GPS, authorities contacted the taxicab company to find out the location of the vehicle.

Officer Geoffrey Redd was on patrol that morning. He received the report of the carjacking and located the taxicab parked in the rear of the Save-Stop at the intersection of Clearbrook and American Way. Officer Redd sought backup as he approached the vehicle. The vehicle was empty, but Officer Redd saw a black male, later identified as [the petitioner], walking westbound on Perkins Avenue. He fit the description of the perpetrator provided by the victim. Officer Redd approached [the petitioner] and asked him to talk. [The petitioner] "took off running." By this time, Officer Redd was joined by several other officers. They gave chase to [the petitioner] on foot. Officer Redd instructed [the petitioner] to "just lay down on the ground and let's go ahead and get this . . . over with." [The petitioner] responded that he could not "do that." At this point, [the petitioner] was on a bridge. He walked out to the outside of the railing where there was no protection from falling or jumping. [The petitioner] asked for his mother and threatened to jump if the officers did not comply. Officer Redd summoned [the petitioner]'s mother to the scene. [The petitioner] eventually came back over the railing, was arrested, and taken into custody.

Mr. Rye identified [the petitioner] in a photographic lineup and at trial as the man who robbed him.

[The petitioner] testified at trial that he did not remember anything at all about the incident. He claimed that the first time he saw Mr. Rye was when he entered the courtroom.

[The petitioner]'s memory of that day was hazy. He remembered "seeing things around the house that moved and disappeared and stuff and when [he would] go outside [he] would hear like the birds singing like they [were] talking to [him] when they whistled, they [were] whistling words," calling him a "Sissy Bitch." He also thought that people were "throwing bugs on him." The bugs were "itching" and "biting." [The petitioner] remembered waking up in a hospital, specifically Memphis Mental Health Institute ("MMHI"). [The petitioner] had tried to go to MMHI the night prior to the incident to get medication. The security guard kicked him out and, after that, "everything kind of went black."

[The petitioner] acknowledged multiple prior convictions for theft as a result of "stealing stuff from stores" but could not recall the dates of those convictions. [The petitioner] was asked if he remembered hitting the victim on the head with a rock and claimed that he "wouldn't do nothing like that." As a result, he was questioned about his conviction for reckless aggravated assault from 2009. That incident involved an argument with his neighbor during which [the petitioner] hit his neighbor with a car while the neighbor was sitting in a chair. He recalled pleading guilty to reckless aggravated assault.

At the conclusion of the proof, the jury found [the petitioner] guilty of aggravated robbery.

The trial court held a separate sentencing hearing at which Dr. Debbie Nicholas, a Forensic Services Coordinator for West Tennessee Forensic Services [("WTFS")], testified about her attempts to evaluate [the petitioner]'s competency to stand trial. Dr. Nicholas had interacted with [the petitioner] since 2002. With regard to the evaluation for trial herein, [the petitioner] refused to cooperate in order for her to complete an evaluation. Dr. Nicholas explained that [the petitioner]'s lack of cooperation was not atypical for a person that had been previously diagnosed with paranoid schizophrenia, schizoid affective disorder, atypical psychosis, and an adjustment disorder with depression. Dr. Nicholas testified that [the petitioner]'s diagnoses were manageable with medication and that [the petitioner] had no intellectual disabilities. With regard to this particular case, [the petitioner] had a diagnosis of "malingering" or the "presentation of

symptoms that one does not have." In other words, [the petitioner] could have been exaggerating his symptoms or even presenting symptoms that did not exist.

[The petitioner] was evaluated by MMHI. The evaluation from MMHI revealed that [the petitioner] "hides his true knowledge of the legal system by either being selectively mute . . . or intentionally giving incorrect information." [The petitioner] had been observed in 2002 "telling another patient how to play worse off than he actually was."

[The petitioner]'s mother, Shirley Eggleston, testified at the sentencing hearing. She acknowledged that [the petitioner] did not take his medication on a regular basis unless he was receiving court-ordered treatment. Mrs. Eggleston asked the court to place [the petitioner] in a treatment facility.

[The petitioner] apologized to the victim and asked the trial court for the minimum sentence of twelve years.

At the conclusion of the sentencing hearing, the trial court sentenced [the petitioner] as a Range II, multiple offender to serve eighteen years and six months in the Department of Correction at 85%. The trial court also "[j]udically recommended that [the petitioner] be sent to a facility to receive mental health treatment."

*Eggleston*, 2015 WL 5001197, at *1-3. Our supreme court denied the petitioner's request for permission appeal on January 25, 2016.

## B. *Post-Conviction Hearing*

On December 1, 2016, the petitioner filed a timely pro se petition for post-conviction relief. After the appointment of counsel, the petitioner filed an amended petition claiming trial counsel was ineffective for failing to hire a mental health expert, failing to seek a jury instruction on diminished capacity, and failing to advise the petitioner "regarding character evidence." A hearing was held on August 2 and 30, 2019.

At the hearing, the petitioner stated that despite telling the petitioner she was going to seek a plea of not guilty by reason of insanity, trial counsel neither sought nor entered such a plea. The petitioner testified he had been diagnosed with schizoaffective disorder and claimed that at the time of the crime, he was "unstable" because "the birds were talking to [him.]" The petitioner also admitted he was not taking his medication at that time

- 4 -

because he "kept losing them." According to the petitioner, he sought help at the St. Francis Mental Health Hospital, but the security guard "kicked [him] out." When questioned about his crime, the petitioner testified that he "got upset" and "hit [the victim] with a brick" because he believed that people were "throwing bugs on [him]." Though he admitted that he and trial counsel discussed his mental health issues, the petitioner claimed trial counsel never asked him to explain his version of what happened.

The petitioner affirmed that Dr. Nicholas testified at his sentencing hearing. However, when the State asked about Dr. Nicholas' evaluation, the petitioner admitted he did not speak with her. When the State then inquired as to whether the petitioner did not speak to Dr. Nicholas because he had refused to cooperate with the evaluation process, the petitioner refused to answer. Upon further questioning, the petitioner simply claimed he did not refuse to cooperate with the evaluation. He also claimed he did not recall speaking to someone from WTFS shortly after his arrest nor did he recall that WTFS attempted to evaluate him again in 2013.

The petitioner admitted to his lengthy criminal history, roughly 50 prior convictions, and his familiarity with the criminal justice system. Yet, the petitioner claimed he "must have been confused" when he testified at trial that he could not recall anything about the instant offense. When asked if he recalled his trial testimony that a security guard at MMHI forced him to leave when he was trying to get medicine, the petitioner responded that it "didn't happen." On redirect examination, the petitioner remembered many aspects of his trial testimony, including testifying about his prior mental health history, his previous medication, and that he was not taking his medication at the time of the aggravated robbery. He recalled that he spoke with trial counsel prior to testifying at trial but claimed that he believed he would only be testifying about his mental health, not the details of his crime.

Trial counsel, who had been with the Public Defender's office for more than eight years at the time she represented the petitioner, testified that she started representing the petitioner after his arraignment. Trial counsel attempted to visit the petitioner in jail on several occasions, but he "would not speak with [her.]" The petitioner also refused to speak with "the forensic crew[.]" During her initial meetings with the petitioner, the petitioner "just had kind of a blank, vague look, . . . like he didn't really appreciate where he was or acknowledge it." Trial counsel was, however, able to speak with the petitioner at court appearances. After the initial communication issues were resolved, trial counsel was able to "thoroughly" discuss the State's case against the petitioner with him.

In addition to the State's evidence against him, trial counsel and the petitioner discussed his mental health, including his diagnoses of paranoid schizophrenic, bipolar disorder, delusions, and ADD or ADHD. Trial counsel learned from her meetings with the petitioner's family that the petitioner had previously received treatment for his mental

health conditions. According to his family, the petitioner "would do okay" when medicated. The petitioner's family also informed trial counsel that when the petitioner was not taking his medications, he was aware of his actions and understood right from wrong, but he would "just get mad and do stuff[.]"

When questioned about her trial strategy, trial counsel said her strategy was to "present the facts" of the case and to "challenge the credibility" and "accuracy" of the witnesses' testimony. Trial counsel testified that, despite the petitioner's mental health issues, she did not believe she had a valid basis to claim insanity or request an instruction on diminished capacity especially after reviewing the report from WTFS, which concluded the petitioner was malingering. Additionally, jail officials reported that the petitioner was "teaching other inmates how to exaggerate their mental illness in order to seem worse off than they were." The findings of malingering also convinced trial counsel that it was not in the petitioner's best interest to call the experts who had evaluated the petitioner. While they could testify to his diagnosed mental health issues, they would also be asked about the fact he was diagnosed as malingering, and trial counsel did not want that information placed before the jury.

Trial counsel confirmed that MMHI psychologist Dr. Buechele evaluated the petitioner and determined he was competent and that at the time of the offense, "severe mental disease or defect did not prevent [him] from appreciating the nature or wrongfulness" of his criminal conduct during the aggravated burglary. Additionally, Dr. Buechele determined the petitioner "d[id] not meet the standards for judicial commitment to a mental health institute[.]" Furthermore, Dr. Buechele noted the petitioner failed to cooperate with the evaluation and "intentionally present[ed] himself as more impaired than his actual level of functioning."

Trial counsel testified she was familiar with the diminished capacity jury instruction and explained she "probably would have" requested the instruction; however, the petitioner's behavior during trial was inconsistent with a claim of diminished capacity. According to trial counsel, the petitioner was stable, and she was able to effectively communicate with him. Additionally, the petitioner answered trial counsel's questions, and she "didn't see anything in [the petitioner] during the trial that would have led [her] to believe that he did not understand what was going on at the time." Based on both evaluations, trial counsel determined she would not have been successful in petitioning the trial court for expert funding for additional evaluations or seeking a defense based on insanity or diminished capacity.

In preparing for trial, the petitioner informed trial counsel that he heard voices but did not inform her of his claim that birds and bugs were talking to him before he assaulted and robbed the victim. When trial counsel asked the petitioner about his motivation for

committing the crime, the petitioner told her he "needed a car" and "needed to go[.]" Prior to testifying at trial, trial counsel advised the petitioner to "tell his side of the story[.]" Because the petitioner had admitted to the offense in his statement to police, trial counsel advised him that "there was no point in trying to deny it[.]" Trial counsel did, however, warn the petitioner that "there was a lot of danger in him testifying" because the State could impeach him based on any inconsistencies between his prior statement and his trial testimony and his prior convictions. Additionally, trial counsel advised the petitioner "if he talked about other things he did or denied doing[,]" he would open the door to further impeachment by the State.

At the conclusion of the hearing, the post-conviction court took the matter under advisement. On November 22, 2019, the post-conviction court entered a written order denying the petition. Relating to the issues presented on appeal, the post-conviction court found concerning the petitioner's claim for expert funding and pursing an insanity defense that "[n]o proof was put on at the hearing on this petition of any expert testimony that could have been obtained that would have stated that the petitioner would not have been able to form the intent to commit the aggravated robbery." Concerning the petitioner's claim that trial counsel should have sought an instruction on diminished capacity, the post-conviction court concluded that "no proof having been elicited at the hearings on this petition . . . of any expert who could have been obtained who would have testified that the petitioner could not have formed the requisite intent to commit the crime;" thus, the petitioner has failed to show counsel was ineffective for failing to request an instruction on diminished capacity. Finally, concerning the petitioner's claim that trial counsel failed to fully advise him about the dangers of testifying, the post-conviction court found that both trial counsel and the trial court fully informed the petitioner concerning impeachment evidence.

This timely appeal followed.

### *Analysis*

On appeal, the petitioner contends the trial court erred in finding he received the effective assistance of counsel. More specifically, the petitioner argues counsel was ineffective for 1) failing to have the petitioner evaluated by a private expert; 2) failing to pursue insanity as a defense; 3) failing to request an instruction on diminished capacity; and 4) failing "to warn the petitioner of how to avoid opening the door to impeachment by additional convictions." The State submits the petitioner has failed to meet the burden required of him. Upon our thorough review of the record and the applicable law, we affirm the judgment of the post-conviction court.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the

Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. *Dellinger v. State*, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 688-89. Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

When reviewing trial counsel's performance, this Court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). The fact that a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is given to sound tactical decisions made after adequate preparation for the case. *Id*.

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); *see Dellinger*, 279 S.W.3d at 293-94. On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. *Id*. Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. *Id*. at 457.

## A. Mental Health Evaluation

The petitioner contends trial counsel was ineffective "by failing to secure available public funding for the petitioner to receive an independent psychiatric evaluation to be used in support of a defense of insanity or diminished capacity." However, the petitioner failed to present the testimony of a medical expert or the medical records he claims would have benefited his defense. Likewise, the petitioner has failed to show what additional evidence counsel could have discovered with further investigation. Generally, a petitioner fails to establish his claim that counsel did not properly investigate or call a witness if he does not present the witness or evidence to the post-conviction court because a court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."). Consequently, the petitioner cannot show that counsel performed deficiently by declining to present certain witnesses or evidence at trial, and is, therefore, not entitled to relief. *Id.*

## B. Insanity and Diminished Capacity

Next, the petitioner contends trial counsel was ineffective for failing to pursue the affirmative defense of insanity and for failing to request an instruction on diminished capacity.[1] Despite a pre-trial evaluation finding insanity was not a viable defense and two reports finding the petitioner was malingering, the petitioner contends "it is reasonably probable that an insanity defense would have resulted in a more favorable outcome." Additionally, the petitioner argues trial counsel was ineffective for failing to request an instruction on diminished capacity. However, similar to the petitioner's claim that trial counsel was ineffective for failing to secure "an independent psychiatric evaluation," the petitioner failed to offer any proof, either in the form of expert testimony or medical records, to support his claim that insanity was a viable defense or that trial counsel had a reasonable basis upon which to request an instruction on diminished capacity. Because the petitioner failed to present any evidence in support of his claim, he did not and cannot meet the burden required of him, and therefore, is not entitled to relief. *Black*, 794 S.W.2d at 757.

---

[1] Since much of the proof necessary for addressing these two claims overlaps and the analysis, especially as it relates to the petitioner's burden of proof, is very similar, we have combined the petitioner's two claims into one issue for the purpose of analyzing them on appeal.

In addition to the petitioner's failure to offer any proof supporting insanity as a viable defense or that an instruction on diminished capacity was warranted, the record reveals trial counsel made an informed and strategic decision not to pursue either. Dr. Buechele, a psychologist with MMHI, evaluated the petitioner prior to trial and determined that the petitioner was competent and that at the time of the offense, "severe mental disease or defect did not prevent [the petitioner] from appreciating the nature and wrongfulness of his criminal conduct." Additionally, trial counsel's conversations with the petitioner's family revealed that even when the petitioner was not taking his medications, he was aware of his actions, understood right from wrong, but would "just get mad and do stuff." Trial counsel was also aware of the fact that the petitioner had refused to cooperate with the doctors evaluating him and had been diagnosed as malingering. Finally, trial counsel testified that

> [b]ased upon the report that we had, [there was no evaluation to substantiate a mental defense]. It was determined by West Tennessee Forensics that [the petitioner] was – they said that he was malingering, that would be their testimony, and that he was reported by officials in the jail to have been teaching other inmates how to exaggerate their mental illness in order to seem worse off than they were.

Armed with all of this information, trial counsel determined insanity was not a viable defense and instead focused her defense strategy on challenging the credibility and accuracy of the witnesses' testimony.

Much like her review of the medical evidence revealed to trial counsel that insanity was not a viable defense, her review of those records, as well as her interaction with the petitioner, support trial counsel's decision not to request an instruction on diminished capacity. Per two separate evaluations, the petitioner was found to be uncooperative and diagnosed as malingering. Additionally, reports from the jail revealed the petitioner was coaching other inmates on how to exaggerate their symptoms and make their conditions appear worse than they actually were. Finally, trial counsel testified that during the trial, she was able to effectively communicate with the petitioner, and the petitioner answered her questions. According to trial counsel, she did not "see anything in [the petitioner] during the trial that would have led [her] to believe that [the petitioner] did not understand what was going on at the time."

Based on the lack of proof supporting a claim of insanity, including the fact that the petitioner's family members believed the petitioner was capable of understanding right from wrong despite not taking his medication, the record supports a finding that trial counsel made an informed and sound decision not to seek insanity as a defense and focus on challenging the credibility of the State's witnesses. Similarly, the record supports a

finding that trial counsel made a well-reasoned and sound decision not to seek an instruction on diminished capacity. The fact that a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel. *Cooper*, 847 S.W.2d at 528. Deference is given to sound tactical decisions made after adequate preparation for the case. *Id.* Accordingly, the petitioner is not entitled to relief on these claims.

### C. Impeachment Evidence

Finally, the petitioner contends trial counsel was ineffective for failing to "adequate[ly] prepare" him to testify. More specifically, he argues trial counsel should have explained to him "that the trial court had ruled that if [the] petitioner made positive comments about his own character, the [S]tate would be allowed to cross-examine him" about his prior conviction for reckless aggravated assault. However, as found by the post-conviction court, the petitioner was fully advised by both trial counsel and the trial court. Additionally, despite being fully advised, the petitioner, without prompting by the State's questioning, voluntarily opened the door to impeachment.

According to the record before us, the petitioner's criminal history is rather lengthy, consisting of more than twenty convictions for theft as well as a conviction for reckless aggravated assault. Prior to the petitioner testifying at trial, the trial court held a hearing pursuant to Tennessee Rule of Evidence 609. During the hearing, trial counsel informed the trial court that she had "reviewed [the petitioner's] prior record with him and he is aware that his prior convictions can be used against him." At the conclusion of the hearing, the trial court determined the petitioner could be impeached with his prior theft convictions but could not be questioned about his conviction for reckless aggravated assault. After being questioned by his attorney and prior to being cross-examined by the State, the trial court reminded the petitioner and counsel that,

> if [the petitioner] says that he never hurt anybody before, I am going to let
> the State ask about that conviction, []. I'm just letting y'all know, because if
> he has been convicted of reckless aggravated assault, he has been convicted
> of a crime involving bodily injury.

Then, while being cross-examined by the State, the petitioner claimed to have no memory of committing the instant offense. The petitioner then,

> volunteered, without being asked, . . . . "Since it is not nice to hit an old man
> in the head with no big brick like that." [The petitioner] then suddenly turned
> away from the jury and his attorney to face [the trial] court and stated to [the

trial court], in front of the jury and in their hearing, "Your Honor, I know I wouldn't do nothing like that."

Upon hearing the petitioner's answer, the State immediately sought and was granted permission to impeach the petitioner with his prior reckless aggravated assault conviction. In addition to the record from the petitioner's trial, trial counsel testified during the post-conviction hearing that she discussed with the petitioner his prior record and how it could be used to impeach him should he claim to have never "done something before and you have a record for it, the State will be able to use that against you."

Based on the foregoing, it is clear the petitioner was fully informed on more than one occasion of the dangers of testifying and claiming he would never hurt anyone. Despite these warnings and without prompting from either trial counsel or the State, the petitioner voluntarily opened the door to being impeached with his prior conviction for reckless aggravated assault. Accordingly, the post-conviction court did not err in finding the petitioner failed to meet the burden required of him, and the petitioner is not entitled to relief. The decision of the post-conviction court is affirmed.

### *Conclusion*

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's judgment denying the petitioner post-conviction relief.

_____
J. ROSS DYER, JUDGE